IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DARLA R. WALKER, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:08-CV-94-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER</u>

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

<u>FINDINGS AND CONCLUSIONS</u>

A.     STATEMENT OF THE CASE

Plaintiff Darla Walker filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act. She applied for SSI benefits on August 1, 2003, and disability insurance benefits on November 19, 2003, alleging disability commencing February 3, 2003. Walker remained insured for purposes of disability insurance benefits at all times relevant to the Commissioner's decision . (Tr. 15, 96).

After her applications for benefits were denied initially and on reconsideration, Walker requested a hearing before an administrative law judge (the "ALJ"). ALJ William Helsper held a hearing in January 2006 and issued an unfavorable decision on March 22, 2006. (Tr. 27, 587). The Appeals Council vacated the decision and remanded the case to the ALJ to resolve issues related to Walker's obesity and mental impairments. (Tr. 601). The ALJ held a second hearing on December 7, 2006, and issued a new decision on March 26, 2007, in which he found that Walker was not disabled and was not entitled to disability insurance or SSI benefits because she retained the ability to perform her past relevant work. (Tr. 14-21, 44). The Appeals Council denied Walker's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 6).

B.  STANDARD OF REVIEW

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C. ISSUES

1. Whether the ALJ's assessment of Walker's residual functional capacity is supported by substantial evidence; and

2. Whether the ALJ's determination that Walker is capable of performing her past relevant work is supported by substantial evidence.

D. ADMINISTRATIVE RECORD

1. Treatment History

Records from Tarrant County Mental Health and Mental Retardation services (MHMR) reflect that Walker was evaluated in January 2003 for complaints of anxiety, depressed mood, sleep disturbance, decreased energy, decreased concentration, and vague thoughts of dying. Her primary care physician had prescribed Paxil, which helped her symptoms. She had tried other medications in the past with mixed success. (Tr. 255). A mental status examination found Walker to be tearful and anxious. Her thought processes and judgment were intact. She showed good insight into her depression, but poor insight with respect to her history of drug use. Attention and memory testing indicated that she was distracted. (Tr. 254). MHMR psychiatrist Marco Renazco, M.D., diagnosed major depression disorder, recurrent and severe, polysubstance dependence, and rule out histrionic personality disorder. He assigned her a Global Assessment of Functioning score of 40,[1] and recommended a treatment regimen that included Paxil, substance abuse counseling, and monthly

---

[1] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.* at 34.

appointments at MHMR. (Tr. 253).

Treatment records from Walker's primary care physician in 2003, Steve Hardee, M.D., reflect treatment for hypothyroidism, incontinence, and possible rheumatoid arthritis requiring consultation with a rheumatologist. Hardee also prescribed Xanax for Walker's complaints of stress, depression and anxiety. (Tr. 257-64).

As part of the disability application process Walker underwent psychological evaluation with James C. McCabe, Ph.D., on February 3, 2004. (Tr. 265-269). Walker exhibited a moderate degree of cooperation and effort during the test and was noted to be frequently agitated. She reported onset of her symptoms in 1995, but her condition did not begin to interfere with her work until the previous year when she experienced an exacerbation of her physical problems. (Tr. 266). Her current treatment regimen included Paxil and Zoloft, but she continued to experience some anxiety and depression. McCabe reviewed Walker's medical records, which indicated that Walker's depression and anxiety had improved with medication and her decision to limit contact with her mother and sister. She watched movies with friends, and she and her friends get together to cook, shop, or attend church. She described being homeless for eighteen months and complained of being used by her boyfriends. McCabe noted a frequent theme of victimization. Walker reported having a nervous breakdown in 2000, but had never been hospitalized. (Tr. 266).

Walker described her daily routine as boring. She arose at 10:00 a.m., dressed, and made something to eat. She was in the process of unpacking from a recent move, but she had difficulty lifting things and putting them away. She attended her medical and counseling appointments, and in the evening, she cooked meals and watched movies. Her bedtime was 11:00 p.m., but she did not

sleep well. She reported no difficulty bathing, doing laundry, driving, reading, watching television, taking her medication, and visiting family. With some effort, she was able to prepare meals, shop, pay bills, and enjoy leisure activities. She reported that cleaning her house, taking the bus, attending church, visiting friends and neighbors, and coping with daily responsibilities gave her the most difficulty. (Tr. 266-67).

On examination, Walker's psychomotor activity was within the normal range. Cognition was within the low normal range, and she was able to perform simple arithmetic. Walker was depressed and anxious, and she was found to lack insight into her problems. Her stream of thought was inconsistent, and her pace was rapid at times. Her remote memory was intact, her recent memory was marginal, and her immediate memory and concentration were assessed as mildly impaired. (Tr. 267). McCabe's impression was a major depressive disorder, recurrent and severe, without psychotic features. McCabe also advised that an anxiety disorder and a pain disorder should be ruled out, as should a histrionic personality disorder. (Tr. 267). McCabe assessed a Global Assessment of Functioning score of 45 to 55, with symptoms that were likely to fluctuate.[2] (Tr. 268). Walker's prognosis was guarded because of her history of destructive interpersonal relationships and drug abuse, and continued psychotherapy was recommended. (Tr. 268).

Internist Juan Saitis, M.D., evaluated Walker on February 6, 2004. (Tr. 270-274). Walker complained of chronic joint pain, which she rated as 9/10 without medication and 4/10 with medication, urinary incontinence and leakage, depression, insomnia, and problems concentrating.

---

[2] A GAF score of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34. A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. *Id.*

Walker was 5' 2" and weighed 239 pounds. (Tr. 271). She reported mild to moderate shortness of breath, but estimated that on a good day she could walk up to one mile if she walked slowly. Walker was not tender to palpation across her lumbar spine and demonstrated full range of motion. She was able to squat with assistance, bend forward, and reach her ankles with her fingers. Straight leg raising was negative for radicular signs, but Walker complained of mild pain at 45 degrees. Saitis diagnosed morbid obesity, chronic lung disease, anxious depression, degenerative joint disease, bilateral fibrocystic disease of the breast, stress urine incontinence, and hypothyroidism. (Tr. 272).

The state agency medical consultants reviewed the evidence and found Walker was capable of work requiring medium exertion. (Tr. 302-09). The state agency psychology consultants further found that Walker's mental impairments resulted in mild restriction in her activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 283-296). The state agency psychological consultants concluded that Walker could understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with supervisors and coworkers, and respond appropriately to routine workplace changes. (Tr. 281).

On January 20, 2004 Walker underwent surgery for repair of a ventral hernia and excision of a mass in her right breast. She was released from care in February with no restrictions. (Tr. 504-13). Walker saw Michael England, M.D., in April 2004 for evaluation of her urinary urgency, frequency, and incontinence. (Tr. 348-49). Walker was enrolled in pelvic floor therapy and instructed on exercises to treat incontinency. (Tr. 331, 335).

Rheumatologist Raymond Pertusi, D.O., evaluated Walker and opined in June 2004 that there

was mixed evidence for a diagnosis of rheumatoid arthritis. He recommended ruling out other causes, but Walker should be monitored for the development of an autoimmune disease. (Tr. 367). He opined that Walker had an underlying sleep disorder that was causing her chronic pain syndrome, and also suggested that Walker follow the treatment protocol for fibromyalgia. (Tr. 368-69).

Renazco, Walker's treating psychiatrist at MHMR, prepared a mental status report in June 2004. He had been treating Walker for approximately eighteen months and she had been compliant with treatment. (Tr. 379). He stated that her motor and speech patterns were normal; she was well oriented in all spheres; her mood was depressed; her thoughts were logical and goal-directed; her memory was adequate; and she focused well. He assessed her insight and judgment as good and her ability for abstraction was intact. (Tr. 379-80). Her diagnoses included major depressive disorder with histrionic traits. Renazco assessed a good prognosis with continued treatment. He also opined that her ability to relate to others and sustain work was fair, and he expected she would have some difficulty coping with stress. He considered her capable of managing benefit payments in her own best interest. (Tr. 380).

Walker continued to see Hardee for routine care of diffuse body pain, headaches, and numbness in her fingers. (Tr. 540-50). Her diagnoses included fibromyalgia and chronic obstructive pulmonary disease. (Tr. 545, 547). A stress echocardiogram in July 2004 was discontinued because Walker was short of breath, but showed that her functional aerobic capacity was significantly decreased. (Tr. 447). On December 17, 2004, Walker underwent a hysterectomy and surgery to repair a recurrent ventral hernia. (Tr. 522-524).

Russell Gamber, D.O., evaluated Walker on November 22, 2005 for her complaints of

chronic neck pain, jaw pain, and low back pain. (Tr. 558). She used ice packs, a heating pad, anti-inflammatory medication, pain medication, muscle relaxers, cervical pillows, massage, and chiropractic treatment for relief. Her pain was aggravated by cold weather and standing or sitting for long periods. Gamber reviewed a magnetic resonance imaging (MRI) report from June 2005 that revealed multilevel disc dessication along Walker's lumbar spine, a prominent disc bulge at L3-L4, and a moderate bulge at L5-S1. The MRI study of her cervical spine showed disc bulges at C5-C6 and C6-C7 that moderately indented the thecal sac. (Tr. 558). A physical examination revealed various areas of somatic dysfunction, which Gamber palpated and treated. (Tr. 559). His impression was depression and fibromyalgia.

Additional MHMR treatment records reflect that Walker continued to be treated for major depressive disorder. Her diagnosis remained unchanged, but her GAF score in March 2005 was 50. (Tr. 647). By September 27, 2005 Walker's depression was deemed mild and her GAF score was listed as 55, indicating only moderate symptoms. (Tr. 645). During a follow-up visit in January, Walker reported improvement in her mood since her medication was changed from Paxil to Lexapro. (Tr. 642). Further improvement was noted in subsequent records, and Walker's Global Assessment of Functioning had improved to 60 by March 13, 2006. (Tr. 665-69).

Walker attended a second consultative psychological evaluation with Carol R. Wadsworth, Ph.D., on September 6, 2006. (Tr. 617-622). The evaluation took longer than usual because of Walker's talkativeness, tangential or overly detailed thoughts, and restroom breaks. During the evaluation, Walker expressed anger at others and blamed others for her difficulties. (Tr. 617). Walker stated that her depression began in 1991, but she first sought treatment for depression in

1995. Her current medications included Lexapro and Xanax for depression and anxiety. She reported that her mood varies, but it was better than it had been in a long time. (Tr. 617-18). She had four or five good days each week, but on other days felt agitated, frustrated, hopeless, and overwhelmed. She enjoyed swimming and exercised in the pool for about two hours each day. She complained of being easily distracted and was occasionally forgetful, but reported no significant memory problems. She complained of difficulty falling asleep. She reported periods of anxiety, which occurred three to six times month depending on the stress in her life, but Xanax was effective in relieving these episodes. (Tr. 618).

Walker testified that she was able to drive, but her license had expired. She managed her own money, kept track of her appointments "80% of the time," cooked, did most of the housework and laundry, and tended to her personal hygiene. Her daily activities included visiting her grandson, swimming, reading, watching television, and cooking. (Tr. 618). She lived with her teenaged daughter. She had friends in Lubbock and also had one friend in Fort Worth that she saw several times a week. She occasionally attended AA meetings or church, and she was able to get along with others in public settings. She reported that it took her longer to do things because of her physical problems, but described herself as meticulous. (Tr. 618-19).

On mental status evaluation, Walker was cooperative and put forth a good effort. Her mood was euthymic with a normal affect range, and she expressed appropriate and logical thoughts and associations. (Tr. 620). She was able to remember two out of four words after a six-minute delay and remembered the other two with prompting. She recalled the most recent Presidents and made one mistake on serial sevens, which she corrected. Her IQ score placed her in the average range of

intelligence, and her reading, spelling, and arithmetic skills were at a high school level or better. (Tr. 621). Wadsworth diagnosed major depressive disorder, recurrent, in partial remission, anxiety disorder, and an unspecified personality disorder. Wadsworth assessed a current GAF score of 60. Wadsworth assigned a fair prognosis, noting that Walker's depression and anxiety disorders were fairly well managed with medication, but opined that Walker's personality traits could pose some difficulty in a work setting. (Tr. 621-622).

In assessing Walker's ability to perform work-related activities, Wadsworth opined that Walker's mental impairments did not affect her ability to understand, remember, or carry out instructions. (Tr. 623). Wadsorth found moderate limitation in Walker's ability to interact appropriately with supervisors and to respond to work pressures in a usual work setting, and assessed slight restriction in Walker's ability to interact appropriately with the public or coworkers and respond to changes in routine work-setting. (Tr. 624). Wadsworth explained that Walker had a tendency to minimize her personal responsibility, shift blame to others, have anxiety attacks when under pressure, and make poor or impulsive decisions. (Tr. 624).

O.B. Raulston, an orthopedist, performed a consultative examination on September 27, 2006. (Tr. 626-641). Walker complained of upper back and neck pain, low back pain, heel spurs, intermittent knee pain, and fibromyalgia. She reported limited tolerances for walking, standing, and sitting, and did not believe that she could lift more than ten pounds on an occasional basis. (Tr. 626-627). Her gait and station were normal, and she performed heel and toe walking with minimal difficulty. She was able to squat and rise from that position, and got on and off the examination table without difficulty. She also exhibited good finger control. (Tr. 627-28). She exhibited full

range of motion in her upper extremities. Straight leg raising was negative. Walker exhibited decreased sensation in the lateral left leg and the lateral border of the left foot. Deep tendon reflexes were 2+ and equal in all extremities and no muscle weakness was detected. (Tr. 628). Raulston reviewed the MRI studies of Walker's cervical and lumbar spines, which showed mild bulging discs at C5, C6, C7, L3, and L4 with minimal stenosis. No significant degenerative joints changes were seen. (Tr. 629). Raulston's clinical impressions included degenerative disc disease along the cervical and lumbar spine; mild degenerative joint disease of the knees; no findings of fibromyalgia or plantar fasciitis; and chronic occipital headaches. (Tr. 629).

Raulston also provided an assessment of Walker's ability to perform work-related activities. He indicated that she can lift and carry ten pounds occasionally and less than ten pounds frequently. He also found that she can stand and walk for at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday, but would need to periodically alternate between sitting and standing to relieve discomfort. (Tr. 632-33). He further advised that pushing and pulling were limited in both the upper and lower extremities. While she could occasionally climb ramps, balance, kneel and stoop, Raulston advised that Walker should not crouch or crawl. (Tr. 632-633). He also opined that her ability to reach was limited to an occasional basis. He noted that overhead reaching would increase Walker's neck and low back symptoms. He found no limitations in her manipulative abilities for handling, fingering, or feeling. (Tr. 634).

2. Administrative Hearings

Walker was born October 27, 1956. (Tr. 98). She completed high school and approximately two years of college. (Tr. 47, 111). Walker has worked as a waitress, EKG technician, receptionist,

telemarketer and telephone interviewer, and surgical scrub technician. (Tr. 106).

Walker testified that she lived with her teenaged daughter. Walker did the laundry, cooking, and shopping, but pain interfered with her ability to perform housekeeping tasks. (Tr. 48). She also estimated that she used the bathroom ten to twenty times a day. Walker testified that depression affected her energy and made it difficult for her to function. She complained of poor concentration, irritability, and panic attacks that occurred two or three times a week. She used Xanax and relaxation techniques to deal with stress. (Tr. 50). Walker testified that she took a nap for an hour or two each day. She attended AA meetings two or three times a month, and she had not used marijuana or other illegal drugs for over a year. (Tr. 51).

Psychiatrist John Simonds, testified as a medical expert. (Tr. 52). Simonds opined that Walker had two primary problems. The first was major depressive disorder, which had proved treatable with medication. Walker was functioning at a mild to moderate range of depression with partial remission, which could be expected to cause some limitation in concentration that would affect her ability to perform detailed work-related tasks. (Tr. 52-53). Her second problem was her history of arthralgias, but physical findings were minimal. Simonds opined that Walker would be limited to the walking, standing, and lifting requirements of light work (Tr. 53). Simonds found that Walker's other conditions, including her thyroid disorder, hernia, and pulmonary disease, imposed no further restrictions. (Tr. 53).

Vocational expert Carol Bennett testified that a surgical technician was light work and skilled, with a specific vocational preparation (SVP) level of 6; work as a waitress was also light work and semi-skilled (SVP 3); and an appointment setter/telephone solicitation or receptionist was

sedentary work and semi-skilled (SVP 3 or 4).³ (Tr. 54). Bennett testified that an SVP of 3 represented repetitious work that involved some detail, but was not complex. (Tr. 55). She also testified that it would be difficult to sustain employment if an individual was absent from work three days a month. (Tr. 55).

  3. ALJ Decision

The ALJ found that Walker had not engaged in substantial gainful activity since her alleged onset date. He also found that Walker's severe impairments included depression, anxiety, rheumatoid arthritis, ascites, and plantar fasciitis, but she had no impairments meeting or equaling the criteria of any listed impairment. The ALJ determined that Walker had the residual functional capacity for light work limited to non-complex tasks, which was consistent with the demands of her past relevant work as a waitress. Accordingly, the ALJ concluded that Walker was not disabled and was not entitled to disability insurance benefits or SSI payments.

E. DISCUSSION

Walker asserts that the Commissioner's decision is unsupported by substantial evidence because it is based on a flawed residual functional capacity (RFC) assessment. In particular, she asserts that the ALJ failed to consider all of her severe impairments, failed to recognize and resolve conflicts in the evidence, and did not consider all of the limitations reported by the consultative examiners. Walker also contends that the ALJ did not properly evaluate her credibility.

---

³ The SVP level is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. *See* DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991). Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher. SOCIAL SECURITY RULING 00-4p. *See generally* 20 C.F.R. §§ 404.1568, 416.968; DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991).

RFC is what an individual can still do despite her limitations. 20 C.F.R. § 416.945(a); SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. RFC is not the least an individual can do, but the most. *Id.* It is a function-by-function assessment, with both exertional and nonexertional factors to be considered. *Id.* In assessing RFC, the ALJ will address the claimant's ability to perform sustained work activity on a regular and continuing basis and will resolve any inconsistencies in the evidence. *Id.* The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. SOCIAL SECURITY RULING 86-8.

Walker contends that the ALJ erred in failing to recognize and resolve conflicts in the medical evidence before assessing her RFC. After a consultative examination, Raulston opined that Walker retained the capacity to stand and/or walk for two hours per day, sit for six hours per day, and lift ten pounds occasionally and less than ten pounds frequently (Tr. 632-633). He also opined that Walker must alternate position between sitting and standing and that her ability to reach was limited. (Tr. 633-34). His assessment is most consistent with the performance of a modified range of sedentary work, which requires an ability to lift no more than 10 pounds at a time, sit for a total of about six hours during an eight-hour workday, and stand or walk on an occasional basis or approximately two hours during the workday. SOCIAL SECURITY RULING 83-10, 96-9p. The ALJ,

however, asserted that Raulston found Walker was capable of light level work. (Tr. 18). Light work is defined as lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and even if the weight lifted in a particular job is very little, a job is in this category when it requires a good deal of walking or standing. SOCIAL SECURITY RULING 83-10.

Although the ALJ's assessment of Walker's RFC is consistent with Simond's testimony, Simond is a non-examining source, while Raulston is a specialist who examined Walker. *See generally* 20 C.F.R. §§ 404.1527, 416.927 (outlining factors to consider in weighing medical opinions). Moreover, the ALJ's decision reflects that he misinterpreted Raulston's opinions; therefore, he never addressed or resolved the issue of a conflict between these two medical source opinions. This error undermines the assessment of Walker's RFC and her ability to perform her past relevant work as a waitress. *See* DICTIONARY OF OCCUPATIONAL TITLES 311.477-030 (rev. 4th ed. 1991)(describing light exertional demands and other vocational requirements of waitress job). The case should be remanded to allow the ALJ an opportunity to consider and resolve the conflicts in the medical source opinions in the record.

Walker also contends that the ALJ failed to consider the vocational significance of all of her impairments, including obesity, and she challenges the ALJ's assessment of her credibility. Given that remand is necessary to reassess the medical opinions of record, the court does not need to decide if the ALJ ignored or gave insufficient weight to some of Walker's impairments, but on remand, the Commissioner should clarify that all of Walker's impairments have been considered. Walker's credibility is also subject to review on remand because the ALJ's misinterpretation of the medical opinions of record could have affected his assessment of her subjective complaints and RFC. For

similar reasons, the court need not address Walker's contention that the physical or mental demands of her past relevant work are inconsistent with a RFC assessment that must be set aside and is subject to being revised on remand.

The ALJ's failure to resolve a material conflict in the record undermines the existence of substantial evidence to support the Commissioner's decision that Walker can perform her past relevant work. Remand is warranted so that the Commissioner can remedy this error and reach a new determination based on all of the evidence of record.

## RECOMMENDATION

The Commissioner's decision should be reversed and remanded for further administrative proceedings consistent with these proposed findings of fact and conclusions of law.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until November 26, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a

proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until November 26, 2008 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED NOVEMBER 5, 2008.

    /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE